UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                      Plaintiff,                        Case Number 24-20429

v.                                           Honorable David M. Lawson

ANTONIO JOHNSON,

                      Defendant.

_____/

**OPINION AND ORDER DENYING MOTIONS TO DISMISS INDICTMENT**

On July 24, 2024, Detroit Police officers observed defendant Antonio Johnson enter a funeral reception wearing a black ski mask and carrying a firearm with an extended magazine in his pocket. As the officers approached and entered the establishment, they saw Johnson throw the firearm on the ground. The officers then arrested Johnson and secured the firearm, which they confirmed was equipped with a machine gun conversion device (MCD), frequently referred to as a "switch." Johnson eventually was charged in a two-count indictment with possession of a machine gun in violation of 18 U.S.C. § 922(o) and possession of ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). He has filed motions to dismiss both counts of the indictment. In his first motion, he argues that the statute on which the charges are based is unconstitutional, both facially and as applied to him, according to the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In his second motion, he asserts that the Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406 (2024) (discussing the definition of "machinegun" as interpreted by government agencies), narrows the scope of section 922(o) such that it does not apply to the weapon he possessed. Clear Sixth Circuit precedent holds that sections 922(g)(1) and 922(o) are constitutional on their face, and Johnson has not made an adequate showing that the statutes are unconstitutional as applied to him. His argument that the

weapon he allegedly possessed is not a machinegun within the meaning of the statute cannot be decided by motion, since it requires a factual determination that only can be achieved at a trial. Therefore, both motions will be denied.

I.

The grand jury returned the two-count indictment against the defendant on August 6, 2024. According to the affidavit supporting the criminal complaint, the charges are based on the July 24, 2024 incident described above.

Johnson, who is 31 years old and a lifelong resident of the Detroit area, has a lengthy criminal history. He has been on criminal supervision on a nearly continuous basis since he was 17 years old and has numerous prior felony convictions covering a range of conduct, including carrying a concealed weapon, possession of a weapon by a felon, fleeing a police officer, and assault with a dangerous weapon. Many of these offenses took place while he was on probation or parole. The criminal complaint and the pretrial services report differ slightly as to the dates of the convictions and the exact prior charges, but the differences largely are immaterial. As specified in the complaint:

- On April 7, 2014, Johnson pleaded guilty to a charge of carrying a concealed weapon (attempt) and was sentenced to a two-year term of probation.

- On April 17, 2015, Johnson pleaded guilty to being a felon in possession of a weapon and was sentenced to one to five years in prison.

- On September 16, 2016, he pleaded guilty to fleeing and eluding in the third degree and was sentenced to a six month to five-year term of incarceration.

- On February 22, 2018, he pleaded guilty to felonious assault, felony firearm, and fleeing and eluding in the third degree and received a two-year prison sentence.

ECF No. 1, PageID.3-4. The pretrial services report states that additional charges remain pending, and Johnson has eleven outstanding warrants for failing to appear on those matters, which

primarily are motor vehicle offenses but also include misdemeanor aggravated assault and shoplifting charges. The pretrial services report also indicates that at least two domestic violence charges concerning the mother of Johnson's child remain open due to his failure to appear at court proceedings.

On September 9, 2024, the defendant filed the present motions to dismiss his indictment under *Bruen* and *Cargill*. He also filed a motion to be released on bond. On September 18, 2024, the Court denied Johnson's motion for bond, finding by clear and convincing evidence that he posed a danger to the community and a risk of flight if released.

## II.

Johnson invokes the Second Amendment in his first motion. That Amendment states that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Despite its plain language, the Supreme Court has determined that the Amendment guarantees an individual right to keep and bear arms irrespective of militia service. *District of Columbia v. Heller*, 554 U.S. 570, 599-600 (2008); *see also Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018).

In *Bruen*, the Supreme Court announced a new test to determine if legislation that regulates the use or possession of firearms offends the Second Amendment. In that case, the Court struck down a New York state law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home, finding that the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 597 U.S. at 71. The Court rejected the "two-step" framework most courts of appeals adopted after *Heller*, which "combine[d] history with means-end scrutiny" in order to assess the constitutionality of regulations impacting Second Amendment rights. *See id.* at 17. Instead, it adopted a new

"standard for applying the Second Amendment," *id.* at 24, one solely "rooted in the Second Amendment's text, as informed by history," *id.* at 19. The new (and current) two-step process goes like this: First, courts must determine if "the Second Amendment's plain text covers an individual's conduct." If it does, "the Constitution presumptively protects that conduct." *Id.* at 24. Second, when a regulation burdens that conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.*

## A.

Johnson argues that the application of that test requires this Court to invalidate 18 U.S.C. § 922(g)(1), which he says is unconstitutional on its face and as applied to him. The Court previously addressed and rejected a similar argument in *United States v. Keels*, 680 F. Supp. 3d 841 (E.D. Mich. 2023). There, the Court took note of the Supreme Court's statements in *Bruen*, *Heller*, and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), that consistently endorsed felon disarmament. *Keels*, 680 F. Supp. 3d at 848 (citing *Heller*, 554 U.S. at 625-26, 627 n.26 (stating that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful"); *McDonald*, 561 U.S. at 786 (emphasizing that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill'"); and *Bruen*, 597 U.S. at 17 (assuring that the decision was "[i]n keeping with *Heller*")). Add to that the latest endorsement of felon disarmament in *United States v. Rahimi* where the Supreme Court upheld the constitutionality of a related subsection of 18 U.S.C. § 922(g) — section 922(g)(8) — prohibiting the possession of firearms by a person subject to a domestic violence restraining order. *See* 602 U.S. ----, ---, 144 S. Ct. 1889, 1902 (2024) (referencing's

*Heller*'s statement that "many such prohibitions [against firearm possession], like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'").

This Court acknowledges that those statements of constitutionality must be considered *obiter dicta*, since the constitutionality of section 922(g)(1) was not squarely before those courts. Lower courts "are obligated to follow Supreme Court dicta." *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted).  Nonetheless, the Sixth Circuit has observed that those pronouncements "only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686 (6th Cir. 2016).  As a consequence, this Court's analysis in *Keels* is too superficial to provide a clear answer to the question Johnson presents here; a more probing analysis of "the principles that underpin our regulatory tradition" of firearm laws is required.  *Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26-31).

The challenged statute, 18 U.S.C. § 922(g)(1), states:

> It shall be unlawful for any person . . . who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).  Johnson argues that this law is facially unconstitutional, a "difficult challenge," *United States v. Salerno*, 481 U.S. 739, 745 (1987), where he "must establish that *no set of circumstances* exists under which the [statute] would be valid," *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *Salerno*, 481 U.S. at 745); *see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (mem.).

The Sixth Circuit recently held in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), that the statutory prohibition of possession of firearms and, presumably, ammunition, by convicted

felons is not subject to a facial challenge on constitutional grounds, reasoning that "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous," and "[b]ecause . . . most applications of § 922(g)(1) are constitutional, the provision is not susceptible to a facial challenge." *Id.* at 657. The *Williams* panel, however, left open a narrow avenue for an as-applied challenge to the statute's constitutionality.

That panel, applying its brand of originalism, began by examining the history and tradition of firearm regulation in the colonial times and weapons laws before that in English common law jurisprudence, acknowledging that there was a justification for a categorical disarmament of certain individuals. *Id.* at 650-57. Looking to customs and traditions in the Americas, the court pointed to laws that disarmed Catholics and Native Americans. But the court also pointed out that the government allowed an opportunity for disarmed persons on an individual basis to establish that they were responsible citizens and, therefore, could enjoy the privilege of bearing arms. *Id.* at 654, 657.

Projecting those observations to the present day, the *Williams* panel viewed section 922(g) as Congress's intention to categorically disarmed individuals who are convicted of felonies. The panel mentioned that there is legislation that allows a person to apply to remove that disability and demonstrate that he or she is a responsible individual who can possess a weapon, but that legislation is ineffectual because for the last 30 years there has been an appropriations measure that says essentially that no agency may expend funds to entertain such applications. *Id.* at 661. The panel believed that the absence of measures that would permit a disarmed felon to demonstrate responsibility and achieve a restoration of firearm privileges called section 922(g)'s constitutionality into question as applied to some individuals. *Ibid.* To save the statute and correct that defect, the panel legislated a procedure in which courts would furnish the forum for individuals

to demonstrate that they are responsible, gun-worthy people, and therefore section 922(g) would align with gun regulations from the Founding Era.  *Id.* at 662-63.

The *Williams* panel's articulation of responsibility in its dealings with gun possession focused on dangerousness (compared to, for example, Catholics and Indians who had to demonstrate loyalty).  To mount such a challenge successfully, a defendant must "demonstrate that he is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope."  *Id.* at 658.  In determining whether a defendant's prior convictions establish his "dangerousness," courts are to "focus on [the defendant's] specific characteristics," and "[t]hat necessarily requires considering the individual's entire criminal record — not just the predicate offense for purposes of § 922(g)(1)."  *Id.* at 657-58.  The panel provided only limited guidance for that inquiry, constraining its holding to the conclusion that "certain categories of past convictions are highly probative of dangerousness, while others are less so."  *Id.* at 658.

Parsing the compendium of lawless behaviors, the panel opined that "crimes against the person [encompassing] dangerous and violent crimes like murder, rape, assault, and robbery . . . speak directly to whether an individual is dangerous."  *Ibid.*  As the panel explained, "[i]t is hard to see how someone who commits such a dangerous and violent act may overcome the presumption that they are dangerous," and "there is little debate that violent crimes are at least strong evidence that an individual is dangerous, if not totally dispositive on the question."  *Ibid.*  "The dangerousness determination will be fact-specific, depending on the unique circumstances of the individual defendant," but "in many instances — prior murders, rapes, or assaults — the dangerousness will be self-evident."  *Id.* at 660.  The panel observed that other categories of crimes also could suffice to establish dangerousness, suggesting that drug trafficking offenses and violations of 18 U.S.C. 924(c), "while not strictly crimes against the person, may nonetheless pose

a significant threat of danger," because "drug trafficking is a serious offense that, in itself, poses a danger to the community." *Id.* at 659. Continuing, the panel believed that "[o]ther crimes, like burglary, pose a similar threat," since "[c]ourts have recognized that burglary is dangerous because it creates the possibility of a violent confrontation between the offender and occupant." *Ibid.* (cleaned up; citing *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring); *Taylor v. United States*, 495 U.S. 575, 588 (1990); *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010)). As the court of appeals concluded, "[u]ltimately, most of these crimes put someone's safety at risk, and thus, justify a finding of danger." *Ibid.* Considering the appellant's criminal history in light of those guidelines, the panel found that his dangerousness was established by his prior convictions for aggravated robbery, attempted murder, and possessing a firearm as a felon (which involved concealing a gun that had been used to murder a police officer), and held that "[t]he government could've pointed to any one of those convictions to demonstrate his dangerousness," and "[t]hus, [the defendant] may be constitutionally disarmed through a class-based statute like § 922(g)(1)." *Id.* at 662.

At the hearing on the present motion challenging section 922(g)(1) as applied to him, the Court offered defendant Johnson the opportunity to present evidence of his non-dangerousness. That was a formidable task. Johnson has a prior conviction for assault with a dangerous weapon (felonious assault) in violation of Michigan Compiled Laws § 750.82. In *Williams*, the panel suggested that a charge of robbery accomplished with a deadly weapon under Tennessee law "alone is sufficient to conclude that [the defendant], if armed, presents a danger to others or the public." *Williams*, 113 F.4th at 662. The court emphasized that the crime of assault is among those crimes "against the body of another human being" justifying a finding of dangerousness. *Id.*

at 663.  The court went on to explain that an individual convicted of such a crime "will have a very difficult time, to say the least, of showing he is not dangerous." *Ibid.*

Williams did not present any testimony or other evidence at the hearing, but he did argue that the manner of committing his assault crime should establish that he is not a danger to the public.  Johnson's attorney explained that Johnson was trying to defend himself when he assaulted a person who, unbeknownst to him, was an undercover police officer.  That does not strike the Court as a compelling argument of non-dangerousness.  And it does not account for the disturbing features of Johnson's "entire criminal record," which the Court had occasion to consider at an earlier bail review hearing.

As the Court discussed at that hearing, Johnson has been on criminal supervision on a nearly continuous basis since he was 17 years old and has numerous prior felony convictions, covering a range of conduct, including carrying a concealed weapon, possession of a weapon by a felon, fleeing a police officer, and assault with a dangerous weapon.  Many of these offenses took place while he was on probation or parole.  Additional charges remain pending, and he has eleven outstanding warrants for failing to appear on those matters, which primarily are motor vehicle offenses but also include misdemeanor aggravated assault and shoplifting charges.  The pretrial services report also indicates that at least two domestic violence charges concerning the mother of his child remain open due to his failure to appear at court proceedings.

It also is notable that Johnson presently is subject to a protective order resulting from domestic violence allegations brought by the mother of his child, which predates the possession of the machinegun and ammunition charged in the indictment.  Although Johnson is correct that he never has been convicted of domestic violence, this is partially attributable to his failure to appear in court as directed.  Moreover, the police reports documenting the four reports of domestic

violence paint a picture of a pattern of violent behavior that is cause for grave concern of future violence against the child's mother.

Johnson's criminal history holistically viewed amply demonstrates why section 922(g)(1) survives an as-applied challenge here. His underlying assault conviction (combined with a dearth of evidence indicating his reformation) clearly puts him within the cohort of individuals who have been adjudicated as having threatened physical harm to others. Even if there is some doubt whether the laws in effect at the founding provide historical support for disenfranchisement of *all* felons, those laws easily serve as proxies for historical analogues that disarmed individuals deemed to be dangerous. *See United States v. Berry*, --- F. Supp. 3d ---, 2024 WL 1141720, at *19-20 (N.D. Ohio March 15, 2024).

Count two of the indictment charging possession of ammunition by a felon does not violate the Second Amendment.

## B.

Citing *Bruen* again, Johnson also appears to argue that the charge of possession of the firearm — here, a machinegun charged in count one of the indictment — offends the Second Amendment. That charge is based on a different statute, 18 U.S.C. § 922(o), which makes it "unlawful for any person to transfer or possess a machinegun" (with certain limited exceptions not applicable here). This Court addressed and rejected a similar challenge to section 922(o) in *United States v. Tyrese Johnson*, No. 24-20083, 2024 WL 4612888, at *9-13 (E.D. Mich. Oct. 29, 2024). This Court determined that the defendant could not succeed at the first step of *Bruen*'s analytical construct because "the sorts of weapons protected by [the Second Amendment] were those 'in common use at the time,'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), which did not include machineguns. The limitation in section 922(o) is justified by

- 10 -

the historical tradition regulating the carrying of "dangerous and unusual weapons." *Ibid.* Johnson does not develop an argument that machine guns are in any manner similar to weapons in common use at the time of the founding.

Moreover, circuit precedent prevents his argument from gaining traction. Rejecting a post-*Heller* challenge to section 922(o), the Sixth Circuit emphasized that "whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use." *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009). Courts in this circuit repeatedly have explained that *Bruen* did nothing to upend *Hamblen*'s status as binding precedent. *United States v. Caldwell*, No. 24-70, 2024 WL 2784340, at \*5 (N.D. Ohio May 30, 2024); *United States v. Mitchell*, --- F. Supp. 3d ----, ----, No. 24-9, 2024 WL 2272275, at \*3 (N.D. Ohio May 20, 2024); *United States v. Wilson*, No. 23-20081, 2023 WL 8288989, at \*5 (W.D. Tenn. Nov. 7, 2023); *United States v. Sturgeon*, No. 23-6, 2023 WL 6961618, at \*3 (E.D. Ky. Oct. 20, 2023); *United States v. Smith*, No. 23-28, 2023 WL 6880423, at \*2 (E.D. Ky. Oct. 18, 2023). This Court is bound by circuit precedent, and Johnson offers no good explanation for why the Court should vary from the holdings of other district courts that *Hamblen* remains good law.

Johnson argues that section 922(o) is facially unconstitutional, again, a "difficult challenge," *United States v. Salerno*, 481 U.S. 739, 745 (1987), where he "must establish that *no set of circumstances* exists under which the [statute] would be valid," *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *Salerno*, 481 U.S. at 745); *see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024) (mem.). Because he stumbles at step one of the *Bruen* analysis, and he can cite *no examples* where the statute would be invalid, his facial challenge must fail.

The only case holding that section 922(o) is unconstitutional as applied is *United States v. Morgan*, No. 23-10047, 2024 WL 3936767 (D. Kan. Aug. 26, 2024), which held that section 922(o) was unconstitutional as applied to a "Anderson Manufacturing, model AM-15 .300 caliber machinegun" and a Glock switch.  However, *Morgan* conflicts with the weight of substantial authority, and no other case reaches a similar conclusion.  The Court determined that its logic is flawed, and the decision should not be followed.  *See Tyrese Johnson*, 2024 WL 4612888, at *12-13.  The Court adopts that reasoning here and incorporates it into this decision.

The prohibition against possessing a machinegun in 18 U.S.C. § 922(o) does not offend the Second Amendment.

III.

Johnson's second motion addresses a different aspect of section 922(o).  He cites *Garland v. Cargill*, 602 U.S. 406 (2024), which held that the Bureau of Alcohol, Tobacco, and Firearms' classification of bump stocks as prohibited machineguns did not comport with the statutory definition of machineguns and argues that a gun equipped with a "switch" similarly does not qualify for regulation under that statute.

The definition of machinegun in section 922(o) is borrowed from 26 U.S.C. § 5845(b), which states that the term:

> means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).  The government alleges in the indictment that the switch-equipped pistol that the defendant allegedly possessed fits this definition.  The defendant argues that it does not.

- 12 -

Johnson's argument faces several obstacles.  First, although Federal Rule of Criminal Procedure 12(b)(1) allows a defendant to "raise by pretrial motion any defense, objection, or request" before trial, the court may entertain only those motions that it "can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).  A court can resolve a motion to dismiss without a trial "if it involves questions of law instead of questions of fact on the merits of criminal liability." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997).  The Court may "make preliminary findings of fact necessary to decide questions of law," but it may not "invade the province of the jury." *Ibid.*  Consequently, "courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based." *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001).

The indictment charges that Johnson possessed "one 10 mm pistol comprised of a Polymer80 lower receiver and a Glock slide equipped with a machinegun conversion device." ECF No. 11, PageID.17.  Johnson argues that this weapon is not a "machinegun" within the meaning of section 5845(b).  That is a question of fact that cannot be resolved "without a trial on the merits." Fed. R. Crim. P. 12(b)(1).  If the government is not able to offer proofs at trial that the weapon meets Congress's definition of a machinegun, the defendant may move for relief at the appropriate time.  *See* Fed. R. Crim P. 29(a).  But "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000).

Even if the Court could indulge the fact-based inquiry that the defendant urges, the defendant's argument rests on a misreading of *Cargill* and a fundamental misapprehension about how "Glock switch" devices operate compared to bump stocks.  Bump stocks are accessories for semiautomatic rifles that allow the rifle to slide back and forth, facilitating "bump firing," a

- 13 -

technique that uses the recoil from one shot to engage the user's stationary finger repeatedly to depress the trigger, thereby increasing the firing rate.  *Cargill*, 602 U.S. at 411-12.  In *Cargill*, the Supreme Court considered a challenge to an ATF regulation that defined bump stocks as "machineguns" within the meaning of section 5845(b).  The Court held that the regulation exceeded the ATF's statutory authority because a bump stock is not a weapon capable of firing "automatically more than one shot . . . by a single function of the trigger."  *Id.* at 415 (quoting § 5845(b)).  The majority gave two rationales: First, it reviewed the internal function of the gun's trigger mechanism and explained that whether a bump stock is affixed or not, the user "must release pressure from the trigger and allow it to reset before reengaging the trigger for another shot."  *Id.* at 421.  In the Court's estimation, a bump stock "merely reduces the amount of time that elapses between separate 'functions' of the trigger."  *Ibid.*  Second, the Court reasoned that even if a rifle equipped with a bump stock "could fire more than one shot by a single function of the trigger, it could not do so automatically."  *Id.* at 424 (cleaned up).  That is because "a shooter must also actively maintain just the right amount of forward pressure on the rifle's front grip with his nontrigger hand."  *Id.* at 424.

Against this backdrop, it becomes apparent that the defendant's argument doesn't quite fit. He likens Glock switches to bump stocks, reasoning that both require a user to add extra effort beyond the initial trigger pull to cause the weapon to fire multiple shots.  He argues that this extra effort consists of "maintain[ing] the right amount of pressure on the trigger" of a semi-automatic firearm.  ECF No. 17, PageID.73.  But this ignores that the extra effort discussed in *Cargill* consisted of the "forward pressure on the rifle's front grip," *Cargill*, 602 U.S. at 411, not the effort of pulling the trigger itself, which is inherent in the use of any firearm.  Forward pressure on the front grip is a necessary part of the bump firing technique discussed by the Court; it counteracts

the weapon's recoil and "causes the firearm (and thus the trigger) to move forward and 'bump' into the shooter's trigger finger." *Ibid.* With a bump stock, therefore, the trigger must be depressed and released for each succeeding round to fire, a feature that takes such weapons outside the statutory definition of "machinegun."

The defendant's position also is directly contradicted by the Court's opinion itself, which emphasized that "[s]imply pressing and holding the trigger down on a fully automatic rifle is *not* manual input in addition to a trigger's function — it is what causes the trigger to function in the first place." *Id.* at 425 (emphasis added). If the defendant's argument were accepted, it is difficult to see how any machinegun would meet the statute's definition, since holding a trigger in a depressed position is a necessary condition for a machinegun to fire multiple rounds.

*Cargill* expressly contrasted bump stocks and "auto sears" — attachments to AR-15's that function similarly to the Glock switch at issue here — suggesting that the Court itself viewed the devices differently. *See Cargill*, 602 U.S. at 419 n.4 ("Machinegun variants of the AR–15 style rifle include an additional component known as an auto sear. The auto sear catches the hammer as it swings backwards, but will release it again once a new cartridge is loaded if the trigger is being held back. An auto sear thus permits a shooter to fire multiple shots while engaging the trigger only once. ATF has accordingly recognized that modifying a semiautomatic rifle or handgun with an auto sear converts it into a machinegun.) (citing P. Sweeney, 1 The Gun Digest Book of the AR–15, p. 38 (2005), and ATF Ruling 81–4."). So did the *en banc* Fifth Circuit, which reviewed the matter before it reached the Supreme Court. *Cargill v. Garland*, 57 F.4th 447, 453 (5th Cir. 2023) (en banc) ("This process may be contrasted with a fully automatic gun, which is equipped with something called an "auto sear" — a device that serves to re-cock and release the hammer in tandem with the motion of the bolt for so long as the trigger remains depressed. In other

words, the auto sear enables a pendulum swing of the hammer in sync with the bolt without any further input from the user; with one pull of the trigger, an automatic weapon can shoot continuously until ammunition is depleted."). *Cargill* itself actually forecloses the defendant's argument on that point.

The defendant's detailed description of a Glock switch's mechanical workings is of little help to his cause. The Court need not hear from an engineering expert to see the flaws in his argument. The defendant states correctly that components of the switch, when activated, disrupt the leg of the firing pin, "which typically catches after a shot is fired" preventing the firing pin from "stop[ping] another bullet from loading and firing." ECF No. 17, PageID.72-73. Because this pin is disrupted, a single pull of the trigger allows multiple rounds to be fired. This likely meets the statute's requirement that a machinegun can be defined as a component permitting the weapon to fire "automatically more than one shot . . . by a single function of the trigger." § 5845(b). Ultimately, though, the full description of the modified weapon's functioning must await proof at trial.

Ironically, the defendant's mechanical description helps explains why these devices are so dangerous. As one court has said, a pistol fitted with a "Glock switch" device "can empty a standard magazine in about a second or an extended magazine in about two seconds," creating a weapon that "can be difficult to control and is extremely dangerous" and leading to so-called "pray and spray" firing. *United States v. Hixson*, 624 F. Supp. 3d 930, 935 (N.D. Ill. 2022). The statute clearly reflects Congress's attempt to regulate and limit the proliferation of these dangerous weapons.

If any uncertainty remained as to whether Glock switches or similar devices qualify as machineguns under the statute, the government's position is buttressed by decisions of numerous

courts.  Although these decisions pre-date *Cargill*, they provide support for the basic proposition that the devices function mechanically to convert semi-automatic weapons to be capable of fully automatic firing with a single pull of the trigger, satisfying the statute's test.  *See United States v. Dodson*, 519 F. App'x 344, 349 (6th Cir. 2013) ("[T]he 1986 amendments expanded the definition of machinegun, which by including 'any' part—not just a combination of parts—more clearly brought auto sears within the scope of the definition."); *Roe v. Dettelbach*, 59 F.4th 255, 257 (7th Cir. 2023) ("Drop-in auto sears can be installed into semi-automatic guns; once in place, they make the weapon fully automatic, meaning the user must pull the trigger only once to fire repeated shots."); *United States v. Gravel*, 645 F.3d 549, 552 (2d Cir. 2011) ("The Vermont State Police removed the auto sear, disabling the weapon's automatic firing function. The evidence indicated that simply replacing the auto sear would reenable the gun's automatic fire capabilities."); *United States v. Cash*, 149 F.3d 706, 706 (7th Cir. 1998) ("Auto sears enable semi-automatic weapons to be used as fully automatic weapons, which means that auto sears themselves are defined as 'machineguns' by 26 U.S.C. § 5845(b)."); *United States v. Was*, 869 F.2d 34 (2d Cir. 1989) (mem.) (holding that auto sears were machineguns within the meaning of § 5845(b)); *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 697 F. Supp. 3d 601, 624 (N.D. Tex. 2023) (contrasting auto-sears from so-called "forced reset triggers" at issue in the case and noting that "the auto sear in a fully automatic gun takes over to retain and release the hammer for all subsequent shots so that its trigger functions only once in a string of automatic fire."); *United States v. Putman*, No. 18-20133, 2019 WL 2173429, at *2 n.1 (E.D. Mich. May 20, 2019) ("A drop-in auto sear (DIAS) is a device which, when combined with other fire-control parts, can convert a semi-automatic AR-15 to fully automatic.").

- 17 -

For his last argument, the defendant takes a slightly different approach.  He argues that the Court should not defer to the ATF's regulation characterizing auto sears as machine guns for the purpose of 26 U.S.C. § 5845(b), ATF Ruling 81-4, because the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and held that "[c]ourts need not and under the [Administrative Procedure Act (APA)] may not defer to an agency's interpretation of the law simply because a statute is ambiguous."  *Loper Bright Enters. v. Raimondo*, --- U.S. ---, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").  The defendant correctly cites the evolving law, but it has nothing to do with the indictment in this case.  The charged offense is based on statutes enacted by Congress, not on any agency interpretations.  There is no ambiguity that calls for an interpretive resolution, and the government seeks no deference to any agency interpretation, either through a regulation or agency letter.  *See United States v. Farmer*, No. 22-20678, 2024 WL 4254320, at *3 (E.D. Mich. Sept. 20, 2024) (Drain, J.) (rejecting an argument that *Loper Bright* required judicial construction of section 5845(b) and emphasizing that "[t]he statutory definition of machinegun is plain and unambiguous, and the ATF's interpretation of the statute is not at issue.").

## IV.

Neither section 922(g)(1) nor section 922(o) is repugnant to the Second Amendment.  There is no legal basis to dismiss either count of the indictment.

Accordingly, it is **ORDERED** that the defendant's motions to dismiss the indictment (ECF Nos. 16, 17) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   November 8, 2024